ARTHUR LEE GIVENS BEY,       )
                                   )
          **Plaintiff,**          )
                                   )
    **vs.**                        )
                                   )           **ORDER**
                                   )
FNU MURRAY, et al.,          )
                                   )
                                   )
          **Defendants.**        )
_____ )

**THIS MATTER** comes before the Court on Motion for Summary Judgment by Defendants Hamilton, Harrington, and Nichols [Doc. 31] and on Plaintiff's Motion to Compel Discovery [Doc. 30].

## I.    BACKGROUND

### A.    Procedural Background

Pro se Plaintiff Arthur Lee Givens Bey, IV, a North Carolina inmate currently incarcerated at Marion Correctional Institution in Marion, North Carolina, filed this action on June 21, 2017, pursuant to 42 U.S.C. § 1983. Plaintiff named the following four Defendants, all identified as correctional officers at Alexander Correctional Institution ("Alexander CI") at all relevant times: (1) Robert Hamilton; (2) Christopher Nichols; (3) FNU Harrington; and (4) FNU Murray.[1] Plaintiff alleges that, on July 9, 2915, Defendants used excessive force against Plaintiff in violation of Plaintiff's Eighth Amendment rights while he was incarcerated at Alexander CI. Plaintiff seeks

---

[1] Defendant FNU Murray was never served with summons and complaint in this matter and he is not a party to this summary judgment motion. The Court is currently awaiting the Plaintiff's response to the Court's order to show cause as to why Defendant Murray should not be dismissed from this action. [See Doc. 42].

compensatory and punitive damages as well as declaratory relief. [Doc. 1 at 20]. The Plaintiff's complaint survived initial review under 28 U.S.C. § 1915(e)(2). [Doc. 9].

On November 13, 2018, the Plaintiff filed the pending motion to compel discovery seeking production of certain videographic evidence by Defendants. [Doc. 30]. On December 3, 2018, Defendants filed the pending summary judgment motion. [Doc. 31]. On December 6, 2018, this Court entered an Order pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), granting Petitioner fourteen days to respond to the summary judgment motion. [Doc. 34]. After moving to extend the response deadline, Plaintiff timely filed his response to Defendants' motion. [Doc. 37]. On August 1, 2019, the Court, on its own motion, ordered the Defendants to file videographic evidence they intended, but failed, to file with the Court in support of their motion for summary judgment. [Doc. 40]. Defendants thereafter submitted certain videographic evidence. [Doc. 41].

B.    Factual Background

1.    Defendants' Summary Judgment Materials

In support of the summary judgment motion, Defendants rely on incident reports by various correctional officers and other witnesses submitted following the incident, certain videographic evidence, and other prison records and policies, as well as on the affidavits of Defendants Raymond Hamilton, Ashley Harrington, and Christopher Nichols. [See Docs. 31-1 through 31-3]. Defendants' forecast of evidence shows the following:

Plaintiff is currently serving a life sentence for first-degree murder. He was convicted on November 21, 2014. He was taken into the custody of the North Carolina Department of Public Safety on November 24, 2014. He has been incarcerated at various prisons since that time. On the date of the incident at issue, Plaintiff was an inmate at Alexander Correctional Institution ("Alexander CI"). [Doc. 31-1 at ¶ 9: Hamilton Aff.]. The Plaintiff was twice previously

incarcerated in the North Carolina prison system for assault with a deadly weapon inflicting serious injury. [Doc. 31-1 at 39-40]. During his current incarceration, the Plaintiff has been charged with and found guilty of nine (9) infractions ranging from profane language to possession of weapon. [Id. at ¶ 8 (citing Doc. 31-1 at 42)]. Three of these nine infractions were related to the incident giving rise to the Plaintiff's Complaint. [Id.].

On the day of the incident, July 9, 2019, Defendant Hamilton was a captain at Alexander CI and the officer in charge of the shift during the time of the incident. [Doc. 31-1 at ¶ 11]. Defendant Harrington was a correctional sergeant officer, [Doc. 31-3 at ¶ 4: Harrington Aff.], and Defendant Nichols was a correctional lieutenant [Doc. 31-2 at ¶ 4: Nichols Aff.]. The incident is mostly simply divided into two separate events, the use of pepper spray and the use of full mechanical restraints. The Court takes these events in turn.

### a. The use of pepper spray.

At approximately 7:57 a.m., Defendant Harrington and Nichols were monitoring the flow of inmate traffic to and from the Blue Unit to the dining hall for the breakfast meal. [Doc. 31-3 at ¶ 11(a)]. The Plaintiff made what sounded to Defendant Harrington liked a threatening comment. The Plaintiff stated, "I wish he would put his hands on me." [Id. at ¶ 11(b)]. Defendant Harrington questioned the Plaintiff about what he said. The Plaintiff immediately became loud and used profane and threatening language. [Id. at ¶ 11(c)]. Defendant Harrington attempted to avoid further confrontation by ordering the Plaintiff to remain calm and to return to his cell. The Plaintiff did not respond to Defendant Harrington's order. Defendant Nichols then ordered the Plaintiff to return to his cell. [Id. at ¶ 11(d)]. The Plaintiff started to move toward his cell, but then stopped and used more profane and threatening language. At that time, Defendant Nichols ordered the Plaintiff to get against the wall and submit to restraints. [Id. at ¶ 11(e)]. The Plaintiff approached

the wall as if he was going to submit to restraints. [Id. at ¶ 11(f)]. At this point, Defendant Harrington had a very uncomfortable feeling about how the event was unfolding. He believed the Plaintiff was attempting to draw Defendant Nichols and himself closer to decrease the officers' reactionary gap. [Id. at ¶ 11(g)]. At this time, Defendant Harrington recalls that the Plaintiff clenched his fists, began breathing heavily, and violently turned toward Defendant Nichols, yelling "Fuck you mother fucker. I'm not going to do shit. I'm going to get your ass." [Doc. 31-3 at ¶ 11(h)].

Defendant Nichols recalls that after he ordered the Plaintiff to get against the wall and to submit to restraints, the Plaintiff turned to the wall, but as he did so he clenched both fists. [Doc. 31-2 at ¶ 11(h)]. Based on the threatening language and body language, Defendant Nichols started to get out his pepper spray. [Id. at ¶ 11(h)]. The Plaintiff turned rapidly toward Defendant Nichols and yelled, "I am not doing shit. It's on mother fucker." [Id. at ¶ 11(i)].

Defendants Harrington and Nichols maintained "proper distance" between themselves and the Plaintiff and continued to give him verbal commands to submit to restraints. [Doc. 31-3 at ¶ 11(h); Doc. 31-2 at ¶ 11(j)]. The Plaintiff refused and Defendant Nichols administered pepper spray to the Plaintiff's facial area. [Doc. 31-2 at ¶ 11(j)]. Defendant Harrington attempted to use his pepper spray at this time, but his can malfunctioned and no spray was emitted. [Doc. 31-3 at ¶ 11(i)]. The Plaintiff then submitted to restraints. Defendant Harrington applied the restraints behind the Plaintiff's back while Defendant Nichols maintained control of the Plaintiff. [Id. at ¶ 11(j); Doc. 31-2 at ¶ 11(k)]. During the incident, the Plaintiff repeatedly referred to his life sentence as a reason not to "mess" with him because he had nothing to lose. The Plaintiff told Defendants Harrington and Nichols to check Plaintiff's history and that he (the Plaintiff) would get one of them. [Doc. 31-2 at ¶ 11(l); Doc. 31-3 at ¶ 11(k)].

After the use of the pepper spray, neither Defendant Harrington nor Defendant Nichols saw that Plaintiff was in distress or even experiencing physical discomfort. The Plaintiff walked normally to the shower area without any signs or symptoms of physical injury. [Doc. 31-2 at ¶ 12; Doc. 31-3 at ¶ 12]. Defendants contend the video of the Plaintiff being escorted to the shower confirms the lack of distress. [Id.]. Defendant Harrington had no further contact or involvement with the Plaintiff related to this incident. [Doc. 31-3 at ¶ 13]. Defendant Nichols began to escort the Plaintiff to the shower area in the segregation unit until Defendant Nichols was relieved by other correctional staff. Defendant Nichols then returned to his post. [Doc. 31-2 at ¶ 11].

### b. The use of full mechanical restraints.

After Defendant Nichols sprayed the Plaintiff with pepper spray, the Plaintiff was escorted to the shower area to be allowed to decontaminate. The video of the Plaintiff being escorted to the shower shows him walking easily, having no problems with his eyes or nose, and not otherwise in distress. [Doc. 31-1 at ¶ 16]. The Plaintiff was allowed to enter the shower area. Defendant asserts that, "[d]ue to privacy concerns, there is no video of the shower area." The door to the shower area was locked and the Plaintiff was told to put his hands through the slot so that his handcuffs could be removed, and he could use the shower. The Plaintiff refused to put his hands through the door. He remained handcuffed and refused to decontaminate. [Id. at ¶ 17].

At some point, the Plaintiff sat down against the shower wall and did not respond to correctional staff. [Id. at ¶ 18]. At or about 9:40 a.m. and out of the abundance of caution and because of an earlier problem with an unresponsive inmate, a Code Blue was called. Medical staff attended to the Plaintiff and found nothing wrong. [Id. at ¶¶ 19-20]. Further, based on Sergeant Murray's report, Defendant Nichols ordered that the Plaintiff be placed in full restraints and that he be escorted to a segregation cell. [Id. at ¶ 20]. Based on Sergeant Murray's report of continued

noncompliance and threats, Defendant Hamilton approved Defendant Nichols' order to employ the use of full restraints.  [Id. at ¶ 21].  The use of restraints was done in compliance with the North Carolina Department of Correction Use of Force Policy and Procedure ("Use of Force Policy") F.1504(h).  [Id.].  Subsection (h) provides

> All inmates will have their hands restrained behind their back before being removed from their cell.  The use of instruments of restraint, such as handcuffs, legcuffs, waist chains, black boxes and soft restraints are used only with approval by the facility head or designee.
>
> (1) Instruments of restraint will be utilized only as a precaution against escape during transfer, prevent self injury or injury to officers or third parties, and/or for medical or mental health reasons.

[Doc. 31-1 at 16].  Some of Plaintiff's personal property was also removed, namely his pants and tennis shoes, which was done in compliance with policy and for the correctional goal of obtaining compliance.  [Doc. 31-1 at ¶ 22].  Defendants do not indicate which policy this is.

Beginning at about 11:50 a.m., approximately two hours after the application of full restraints, the restraints were removed in a staged manner as set out in Section F.1504(g).  First, at 11:50 a.m., the connecting chain was removed.  Then, at 1:50 p.m., the leg restraints were removed.  Finally, at 3:50 p.m. the waist chain and handcuffs were removed.  The fourth component of the restraints, the handcuffs, were removed early due to the Plaintiff's compliant attitude.  [Doc. 31-1 at ¶ 23 (citing Doc. 41-1 at 6)].  When Defendant Hamilton's and Defendant Nichols' shift ended at 5:00 p.m., the Plaintiff was not in any kind of restraint.  [Doc. 31-1 at ¶ 24].

### c.    After the incident.

Defendant Hamilton investigated the incident and drafted the incident report (the "Incident Report").  [See Doc. 41-1 at 9-12].  The Plaintiff refused to give a statement regarding the incident to Defendant Hamilton.  [Id. at 10].  Defendant Hamilton concluded that the initial use of force

under the circumstances, namely the Plaintiff's foul and threatening language, aggressive body language, failure to obey orders, and the presence of eleven other inmates, was "appropriate to achieve the correctional goal of obtaining compliance and keeping staff and inmates safe." [Doc. 31-1 at ¶ 14]. Defendant Hamilton believes the subsequent use of full restraints on the Plaintiff was warranted to achieve a correctional goal. Further, he believes the appropriate amount of force was used to obtain the corrective objective.[2] [Doc. 31-1 at ¶¶ 28, 30].

Plaintiff was charged with and found guilty of three disciplinary infractions for his conduct immediately preceding the use of the pepper spray, including profane language, threatening to harm or injure staff, and disobeying an order. [Doc. 31-1 at ¶ 31]. The Court, however, sees no evidence of infractions issued in relation to any conduct preceding the application of full mechanical restraints to Plaintiff.

### 2. Plaintiff's Summary Judgment Materials

In opposition to Defendants' summary judgment motion, Plaintiff has submitted a brief, his own sworn declaration and various exhibits thereto, including prison policies, Defendants' discovery responses, witness statements, medical records from the day of the incident, other prison records, and certain videographic evidence. [Docs. 37-1 through 37-3]. Plaintiff's evidence conflicts with Defendants' evidence in certain material ways. Plaintiff's forecast of evidence shows, in pertinent part, the following:

### a. The use of pepper spray.

On July 9, 2015, at approximately 7:47 a.m., the Plaintiff and eleven other inmates were

---

[2] The Court notes that, as to any legal conclusions made in Defendants' supporting affidavits regarding use of force, such conclusions have no impact on any legal determination by this Court as to whether any Defendant used excessive force. See United States v. Perkins, 470 F.3d 150, 157 (4th Cir. 2006) (where an arrestee alleged that officers used excessive force, the testimony of the investigating officers who were not present when the incident occurred, and who testified as to the reasonableness of the officer who used the force, did not satisfy the personal knowledge requirement for the admissibility of lay opinion testimony).

called to go to the chow hall to eat.  [Id. at ¶ 10(a), (b)].  On leaving the dormitory, the Plaintiff and the eleven other inmates entered the hallway of their unit, the Blue Unit, where Defendant Harrington and Defendant Nichols were stationed to conduct the flow of traffic to and from the dining hall.  [Id. at ¶ 10(c)].  While in the hallway, one of the other inmates asked, "Why are we on lock-down?"  [Id. at ¶ 10(d)].  The Plaintiff replied, "A pig got stabbed up late last night."[3]  [Id. at ¶ 10(e)].  At this time, Defendant Harrington "angerly-looked at" the Plaintiff and said, "What the fuck did you just say?!"  [Id. at ¶ 10(f)].  The Plaintiff then told Defendant Harrington that he (the Plaintiff) wasn't talking to Defendant Harrington, but to the other inmate who had asked the question.  [Id. at ¶ 10(g)].  Defendant Harrington insisted on making the Plaintiff tell Defendant Harrington what the Plaintiff had said, and the Plaintiff again said he wasn't talking to Defendant Harrington.  [Id. at ¶ 10(h)].  Defendant Harrington then told the Plaintiff to go back to his block.  [Id. at ¶ 10(j)].  The Plaintiff asked Defendant Harrington if Defendant Harrington was refusing to feed him breakfast.  Defendant Harrington replied, "You just fucked that up; go back to the block!"  [Id. at ¶ 10(j)].  The Plaintiff responded, "Fuck it.  I don't give a fuck; I got plenty of food in my room."  The Plaintiff then started to walk back to his dormitory as ordered.  [Id. at ¶ 10(k)].  As the Plaintiff was walking toward his dormitory, Defendant Harrington said, "Fuck you convict!"  The Plaintiff turned around in the middle of the hallway and replied, "No! Fuck your momma; nasty bitch."  [Id. at ¶ 10(l)].

Defendant Nichols then ordered the Plaintiff to get against the wall and to submit to handcuffs.  The Plaintiff complied and turned toward the wall "in a noncombative, non-aggressive manner."  [Doc. 37-2 at ¶ 10(m)].  While Plaintiff was facing the wall, Defendants Harrington and Nichols, as they approached the Plaintiff, both asked the Plaintiff if he had any weapons and asked

---

[3] The record shows that a female staff member had been stabbed approximately seven (7) times on a previous shift.  [Doc. 37-3 at 26].

the whereabouts of Plaintiff's knife.  [Id. at ¶ 10(n)].  The Plaintiff was immediately confused by their questions, so he "non-rapidly turned from the wall" to tell them that he didn't have any weapons in his possession.  [Id. at ¶ 10(o)].  Once Plaintiff turned around completely to tell this to Defendants Harrington and Nichols, they both "unleashed" their pepper spray on him.  The Plaintiff then "non-combatively, non-aggressively, non-threatening[ly]" turned back toward the wall and submitted to handcuffs.  [Id. at ¶ 10(p)].

### b.    The use of full mechanical restraints.

After the Plaintiff was pepper sprayed, he was escorted to the shower are of the segregation unit and placed in the dry shower area.  The staff controls the water in this shower area.  [Doc. 37-2 at ¶¶ 10(q), 12].  Once there, the Plaintiff bent forward to put his hands through a slot so that Sergeant Murray would remove the Plaintiff's handcuffs and allow the Plaintiff to begin to decontaminate.  [Id. at ¶ 13].  Instead, Sergeant Murray accused the Plaintiff of having some sort of weapon in his hand and left the Plaintiff in handcuffs.  Sergeant Murray said that the Plaintiff was disruptive and threatening Sergeant Murray's co-workers.  Sergeant Murray, therefore, refused to decontaminate the Plaintiff and walked away.  [Doc. 37-2 at ¶ 13].  Contrary to the prison's use of force policy, a DC-442 Refusal of Treatment form was not completed relative to the Plaintiff's alleged refusal to decontaminate.[4]  [Doc. 37-2 at ¶¶ 23, 25].  The Plaintiff was not examined by medical personnel at this time.  [Id. at ¶ 14].

At approximately 9:30 a.m., the Plaintiff began to get a headache and excruciating pain in his chest.  He tasted blood in his mouth and throat.  [Doc. 37-2 at ¶ 16].  The Plaintiff spit on the

---

[4] Included in Plaintiff's evidence is a Statement by Witness prepared by Officer Ching Xiong.  Xiong writes, "On 7/9/15 Inmate Arthur Givens was brought to A-wing after being spray [*sic*] from another unit.  When we put Inmate Arthur Givens in the shower he refuse[d] a decon shower and medical assistance…."  Officer Ziong's statement is dated August 25, 2015, approximately six weeks after the incident. [Doc. 37-3 at 57].

shower floor and noticed "light-red droplets of blood mixed with yellow-colored mucus" in his sputum. [Id.]. The Plaintiff's neck, shoulders, back of the head, face, back, upper chest, and ears began to burn extremely badly. [Id.]. The Plaintiff got the attention of Officer Xiong, showed the officer his condition, and explained how he was feeling. The Plaintiff then collapsed onto the shower area floor. [Doc. 37-2 at ¶ 17]. After the Plaintiff collapsed, Officer Xiong issued a Code Blue for medical assistance. [Id. at ¶ 18]. The Plaintiff was still handcuffed at this time. [Id. at ¶ 19].

After the Plaintiff was medically assessed as a result of the Code Blue called by Officer Xiong, the Plaintiff was made to stand up, with assistance. The Plaintiff's pants and tennis shoes were removed from his body. The Plaintiff was placed in full mechanical restraints[5] at this time, not having been allowed to decontaminate from the pepper spray. [Doc. 37-2 at ¶¶ 20, 22]. The medical records reflect that Plaintiff was assessed by medical personnel around 9:40 a.m. when the Code Blue was called. The medical records also reflect that "code was called for him spitting up blood, he was placed in full restraints after medical assessment" and reference yellow sputum as a respiratory symptom. [Doc. 37-3 at 59]. Prison physician, Marta Kalinski, MD, also responded to the Code Blue.[6] On arrival, she found the patient "lying down in the shower area. As per nursing staff and custody team, I was told patient fell down suddenly but remained conscious. Patient did not appear being in pain. He had semi-opened eyes, regular breathing and

---

[5] The Plaintiff alleges and the Defendants' evidence generally reflects that the full mechanical restraints consisted of shackles around the Plaintiff's ankles; a chain around the Plaintiff's waist; sliding handcuffs connected to both sides of the waist chain and securing the Plaintiff's arms behind his back, each toward the opposite side of his body; and a chain running from the ankle shackles up between the Plaintiff's legs and attached to the waist chain at the small of Plaintiff's back. [Doc. 1 at ¶ 18; Doc. 31-1 at ¶ 23 (citing Doc. 41-1 at 6)].

[6] The "encounter date" listed on Dr. Kalinski's record for this encounter is July 10, 2015 at 1:30 p.m. Dr. Kalinski's manually entered narrative regarding her subjective observations, however, directly cites the encounter with the Plaintiff at the Code Blue on July 9, 2015. [Doc. 37-3 at 60].

normal appearing skin on his face.  Patient did not respond to my questions and did not change body position when asked to make an attempt."  [Doc. 37-3 at 60].  Dr. Kalinski describes the Plaintiff as appearing well, having a flat affect, and in no apparent distress.  [Id.].  The medical records do not reflect any refusal by the Plaintiff to decontaminate.  [Doc. 37-2 at ¶ 24].

The Plaintiff states that at the time he was placed in full restraints, he had been "rendered helpless, surrendered, non-threatening, non-combative, non-aggressive, and unable to communicate (although conscious & alert)."  [Doc. 37-2 at ¶ 22].  The Red Unit Shift Narrative documents that at 9:50 a.m.:

> CODE BLUE INMATE ARTHUR GIVENS #0146841 IN LOWER A-WING, SHOWER. MEDICAL ASSESSED INMATE AND HE APPEARED OK. INMATE PLACED IN FULL MECHANICAL RESTRAINTS AT THIS TIME DUE TO HIM THREATENING TO "KILL STAFF" AND DUE TO THE PRIOR USE OF FORCE ON BLUE UNIT.  INMATES PERSONAL PROPERTY WAS ALSO REMOVED PER THE OIC [officer-in-charge].  INMATE MOVED FROM THE SHOWER TO CELL LPODA019. MEDICAL DID A RESTRAINT CHECK. 15 MINUTE CHECKS ARE BEING UTILIZED DUE TO HIM BEING IN FULL RESTRAINTS.  OIC NOTIFIED AND PRESENT DURING THIS INCIDENT.

[Doc. 37-3 at 54-55].  Under the authority of Defendant Nichols and the order of Defendant Hamilton, the Plaintiff remained in full mechanical restraints for six hours and in handcuffs for eight hours, still without having been allowed to decontaminate from the pepper spray.  [Doc. 37-2 at ¶¶ 20, 21].

### c.      After the incident.

The Plaintiff denies recalling that Defendant Hamilton ever asked him to give a statement related to the incident.  Rather, the Plaintiff states that he did not make a written statement on his own behalf because, when Defendant Hamilton allegedly came to his cell to ask for a statement, he was on a hunger strike and deeply asleep and wearing ear plugs.  [Doc. 37-2 at ¶ 29].

### 3.     The Video Evidence

Both parties rely on video evidence in support of their respective positions on summary judgment.  As further discussed below in relation to the Plaintiff's pending motion to compel, the video evidence currently before the Court depicts only the use of pepper spray on the Plaintiff and his being escorted to and placed into what is presumably the shower area cell.  The footage has no audio component.  As such, the words exchanged between the Plaintiff and Defendants Harrington and Nichols cannot be discerned.

In any event, the Court has observed the video footage, and makes the following findings:

First, neither side's version of events is entirely supported by the footage.  Second, after an obvious verbal altercation between the Plaintiff and Defendant Harrington, the Plaintiff turned only very briefly toward the wall, his hands not ever actually touching it, before he turned back toward Defendants Nichols and Harrington and was sprayed with pepper spray.  Third, Defendant Nichols engaged his pepper spray canister in the direction of the Plaintiff for approximately one second, only.  Fourth, the video appears to confirm that no pepper spray was emitted from Defendant Harrington's pepper spray canister.   Fifth, the Plaintiff turned away from the pepper spray aerosol and appeared to avoid some amount of the short burst of spray emitted from Defendant Nichols' canister.  Sixth, while the Plaintiff was escorted from the Blue Unit to the Red Unit shower area cell, he did not appear to be in any distress.  Rather, he walked deliberately and showed no signs of having been impacted by the pepper spray.

## II.     STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III.     DISCUSSION

### A.     Defendants' Motion for Summary Judgment

#### 1.     Excessive Force Standard.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments," U.S. CONST. amend. VIII, and protects prisoners from the "unnecessary and wanton infliction of pain," Whitley v. Albers, 475 U.S. 312, 319 (1986).  To establish an Eighth Amendment claim, an inmate must satisfy both an objective component–that the harm inflicted was sufficiently serious–and a subjective component–that the prison official acted with a sufficiently culpable state of mind. Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996).

When an inmate claims that prison officials used excessive force on him, he must meet a higher standard to establish the subjective standard.  This is because prison "[o]fficials are entitled to use appropriate force to quell prison disturbances."  Williams, 77 F.3d at 761. "Because officials must act 'in haste, under pressure, and frequently without the luxury of a second chance,' deliberate indifference is not a sufficiently rigorous."  Id. (citing Whitley, 475 U.S. at 320).  "Rather, in these circumstances, in order to make out an Eighth Amendment claim, a prisoner must demonstrate that officials applied force maliciously and sadistically for the very purpose of causing harm."  Id. (internal quotations and citation omitted).

In adjudicating an excessive force claim, the court must consider such factors as the need for the use of force, the relationship between that need and the amount of force used, the extent of the injury inflicted, and whether the force was "applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm."  Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973).  "From such considerations inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced

such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur…. But equally relevant are such factors as the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." Whitley, 475 U.S. at 321.

Furthermore, the Supreme Court has reiterated that "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." Wilkins v. Gaddy, 559 U.S. 34, 1178-79 (2010) (per curiam). In Wilkins, the Supreme Court observed:

> This is not to say that the "absence of serious injury" is irrelevant to the Eighth Amendment inquiry. "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." The extent of injury may also provide some indication of the amount of force applied. As we stated in Hudson, not "every malevolent touch by a prison guard gives rise to a federal cause of action." "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim.

> Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts.

Id. at 37-38 (internal citations omitted).

The Plaintiff's alleges and argues three grounds for finding the use of excessive force: (1) the use of pepper spray by Defendant Nichols; (2) the use of pepper spray by Defendant Harrington; and (3) Defendant Hamilton's approval of the use of full mechanical restraints on Plaintiff.[7] [Doc. 1 at 18-19]. The Court takes these in turn.

---

[7] In his brief, the Plaintiff argues for the first time that Defendant Nichols is also liable for the use of full restraints on the Plaintiff. The Plaintiff, however, made no allegations in his Complaint regarding any involvement by Defendant Nichols in the use of restraints and stated no claims in this regard. [See Doc. 1

## 2.    The Use of Pepper Spray.

The law around whether the use of pepper spray on a prisoner constitutes excessive force is relatively well contoured. The Fourth Circuit has held that "it is a violation of the Eighth Amendment for prison officials to use mace, tear gas, or other chemical agents, in quantities greater than necessary or for the sole purpose of infliction of pain." Williams, 77 F.3d at 763 (internal quotation marks omitted). Also, a correctional officer uses excessive force if he approaches a prisoner and, without any provocation by the prisoner aside from verbal taunts, sprays pepper spray into the prisoner's face. Boone v. Stallings, 583 Fed. Appx. 174, 176 (4th Cir. 2014) (vacating and remanding the district court's grant of summary judgment, finding that there was a genuine issue of fact as to whether a correctional officer deployed pepper spray on a state prisoner before or after handcuffing him and whether the prisoner assaulted an officer and a nurse before the incident, thus precluding summary judgment in the officer's favor; stating that "[o]ur precedent establishes that the use of pepper spray on a docile prisoner could qualify as excessive force"). Further, a genuine issue of material fact exists in a § 1983 excessive force case when a prison guard deploys several bursts of pepper spray on an allegedly docile prisoner. Iko v. Shreve, 535 F.3d 225, 239-40 (4th Cir. 2008).

Here, the Plaintiff contends that his claims against Defendants Nichols and Harrington survive summary judgment because they pepper sprayed him as a result of verbal provocation alone. [Doc. 37-1 at 16-18]. The Plaintiff's own testimony and the videographic evidence of the

---

at 18-19].

The Plaintiff also alleged the use of excessive force by Sergeant Murray for his alleged failure to remove Plaintiff's handcuffs and to allow him to decontaminate from the pepper spray and for placing Plaintiff in full mechanical restraints. [Doc. 1 at 19]. As previously noted, Defendant Murray was never served in this action, is not a party to this summary judgment motion, and may soon be dismissed as a defendant in this matter.

incident bely this assertion. Specifically, the Plaintiff admits that he was ordered to put his hands against the wall after a verbal altercation with Defendant Harrington, that he was questioned about the possession and location of his weapon, and that, in response to that question, he turned completely away from the wall and toward Defendant Nichols to respond, in the context of the presence of eleven other prisoners in the immediate vicinity. The application of pepper spray to a prisoner who is actively defying orders in a way that presents a physical threat of harm to prison officials cannot support an inference that Defendants acted maliciously or sadistically for the purpose of causing the Plaintiff harm, especially where only one short burst of pepper spray was used on the Plaintiff. The Plaintiff's forecast of evidence, therefore, does not meet the rigorous subjective component to establishing the use of excessive force as the use of pepper spray.

In sum, the Plaintiff's forecast of evidence creates no genuine issue of material fact relevant to whether Defendant Harrington's[8] and Defendant Nichols' use of pepper spray constituted excessive force under the circumstances.

### 3. The Use of Full Mechanical Restraints.

The Plaintiff also contends that Defendant Hamilton's approval of the use of full mechanical restraints on the Plaintiff under the circumstances alleged constituted excessive force. Taking the Plaintiff's evidence as true and giving him the benefit of every reasonable inference, Defendant Hamilton, who was present in the shower area when the restraints were applied, approved their use as the officer-in-charge at a time when the Plaintiff had not yet been allowed to decontaminate from the use of pepper spray nearly two hours before, had collapsed on the shower

---

[8] The Court recognizes that Defendant Harrington attests that his pepper spray can malfunctioned and that he, therefore, never pepper sprayed the Plaintiff. [Doc. 31-3 at ¶ 11(i)]. In response, the Plaintiff maintains that he saw "some fluid exit defendant's [*sic*] Harrington['s] canister; and, if this is proven, then defendant Harrington did deploy his O.C. Pepper Spray…regardless of the amount used." [Doc. 37-1 at 15-16]. The Court need not address this argument because it holds that Defendant Harrington's use of pepper spray, if at all, did not violate the Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment.

floor, was noncommunicative, nonthreatening, in excruciating pain, and unresponsive to medical personnel. This forecast of evidence tends to show that there was no need for the use of force after Plaintiff collapsed in the shower, that the relationship between the need and amount of force used was necessarily out of proportion, that the Plaintiff's injuries, as alleged, were sufficiently serious, and that the force was not applied in a good faith effort to restore discipline, but rather for the purpose of causing harm. Further, the Plaintiff's forecast of evidence tends to show that Defendant Hamilton could not have plausibly believed the use of force was necessary. Whitley, 475 U.S. at 321. The Defendants' forecast of evidence, on the other hand, paints a completely different version of events, which if believed, may justify the use of force at issue. The Court, therefore, will deny Defendant Hamilton's motion for summary judgment.

In denying Defendant Hamilton's summary judgment motion, however, this Court expresses no opinion as to what happened before the order was made to apply full mechanical restraints to the Plaintiff. In fact, the Court may not determine whether the events occurred as either party contends, and that is entirely the point in denying Defendant's summary judgment motion—determining the material, disputed facts is an issue for the jury. In sum, for the reasons stated herein, Plaintiff has raised a genuine issue of material fact as to whether Defendant Hamilton used excessive force against him. Defendant Hamilton's summary judgment motion is therefore denied.

Finally, the Court notes that Defendants also raise qualified immunity as a defense. In considering qualified immunity on summary judgment, the Court takes as true Plaintiff's allegations and construes them in the light most favorable to Plaintiff. See Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008). "[S]ummary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants."

<u>Vathekan v. Prince George's Cnty.</u>, 154 F.3d 173, 180 (4th Cir. 1998). Here, according to Plaintiff's version of events, Defendant Hamilton was present for and approved the use of force against the Plaintiff while the Plaintiff was essentially helpless, and not resisting nor disruptive. The Court, therefore, finds that Defendant Hamilton is not entitled to qualified immunity.

In sum, for the reasons stated herein, Defendants' motion for summary judgment is granted as to Defendants Harrington and Nichols, and the motion is denied as to Defendant Hamilton.[9]

### B.     Plaintiff's Motion to Compel

On November 13, 2018, the Plaintiff filed the pending motion to compel discovery seeking production of certain videographic evidence by Defendants. [Doc. 30]. Specifically, the Plaintiff contends that, while the Defendants produced footage of the first part of the incident involving the use of pepper spray on the Plaintiff, Defendants failed to produce footage of the second part of the incident involving the use of full mechanical restraints on the Plaintiff. [<u>Id.</u>]. Defendants did not respond to the Plaintiff's motion to compel.

On December 3, 2018, Defendants filed the pending summary judgment motion. [Doc. 31]. In Defendants' memorandum in support of their summary judgment motion, the Defendants indicated they were filing certain videographic evidence as an exhibit thereto, which was also "being made available to the Plaintiff." [Doc. 32 at 4]. Defendant Hamilton attested in his Affidavit, which was submitted in support of the summary judgment motion, that there was no video footage of the shower area (where the second part of the incident involving the use of full mechanical restraints occurred) "for privacy reasons." [Doc. 31-1 at ¶ 17]. The Defendants, however, did not submit any video evidence to the Court at that time.

Included in the Plaintiff's summary judgment materials is a document titled, "AXCI Video

_____

[9]   The Court, therefore, will make inquiry into appointing counsel for Plaintiff at this stage in the proceedings.

Recording Request." [Doc. 37-3 at 49]. The Video Recording Request was submitted by Defendant Hamilton on the day of the incident. It requests footage from various cameras in the prison that captured portions of the incident. The Video Recording Request, among other things, specifically seeks footage from camera number 29 from 7:59 a.m. until 8:02 a.m. and again from 9:35 a.m. until 10:01 a.m. [Doc. 37-3 at 49]. The footage from 9:35 a.m. until 10:01 a.m. is described as "use of force property removal, full restraints." [Id.].

On August 1, 2019, after reviewing the file in this matter, the Court observed that the Defendants had never submitted any video evidence in support of their summary judgment motion. The Court, therefore, ordered that Defendants had to file any and all video evidence within ten (10) days for the videos to be considered by the Court in adjudicating Defendants' motion. [Doc. 40]. Shortly thereafter Defendants submitted a flash drive to the Court containing videos of the use of pepper spray on the Plaintiff and of the Plaintiff being escorted to and placed in the shower area cell. [See Docket entry on Aug. 6, 2019].

On the Court's review of the recently submitted footage, it is apparent that camera number 29 is positioned in such a way as to and did, in fact, capture footage of the Plaintiff in the shower area cell. While most the interior of that cell is not visible in the footage, a portion of the interior of the cell and the area of outside the cell are visible. This footage certainly may be relevant to estbalishing certain aspects of the parties' conflicting accounts of what happened immediately preceding and during the application of full mechanical restraints to the Plaintiff. It is unclear to the Court why the Defendants withheld this footage when it produced the other available footage for the Plaintiff's viewing. [See Doc. 30 at 1-2]. It is, of course, inconvenient at this stage of the proceedings to have additional discovery enter the mix. The Court, however, sees no other just result. The Defendants failed to produce relevant materials that were timely requested by the

Plaintiff and failed to submit other video evidence to the Court, which informed the existence of at least some footage that the Plaintiff had requested, until now. The Court, therefore, will grant Plaintiff's motion to compel discovery. Fortunately, the missing video footage relates only to Plaintiff's remaining claim against Defendant Hamilton. Defendant Hamilton is, therefore, ordered to produce the video footage from camera number 29 from 9:35 a.m. until 10:01 a.m. on June 9, 2015, as reflected on the Video Recording Request, and make such footage available to the Plaintiff for viewing.

In his motion to compel, the Plaintiff also requests footage from "when correctional officers used a video cam recorder to record them removing the Plaintiff's pants and tennis shoes from his person and subjecting the Plaintiff to a set of full restraints" and "then moving the Plaintiff to an isolation cell (where he remained in full restraints for 4 more hours and still contaminated with pepper-spray on his bare skin and remaining clothing for nearly an additional 102 hours of surveillance camera footage) before allowing the Plaintiff to shower and decontaminate himself on Monday night, at 8:15-8:30 pm, on July 13th, 2015." [Doc. 30 at 1-2].

With respect to this portion of the Plaintiff's motion to compel, the Court finds that any video footage taken of the removal of the Plaintiff's personal property, placing the Plaintiff in full restraints, moving him to the isolation cell, and the four hours he remained in the isolation cell before and while his restraints were removed is discoverable and should have been produced by the Defendants. As to any subsequent footage of the Plaintiff in an isolation cell for the additional "102 hours," the Court finds such footage not discoverable, as it is not relevant to any of the Plaintiff's claims. Fed. R. Civ. P. 26(b)(1). Namely, the Plaintiff's claims are limited to alleged Eighth Amendment violations by the use of pepper spray by Defendants Harrington and Nichols and the application of full mechanical restraints, as approved by Defendant Hamilton. Video

footage of the Plaintiff in an isolation cell in the days following the use of mechanical restraints does not inform the determination of the Plaintiff's claim against Defendant Hamilton.

In sum, the Court grants the Plaintiff's motion to compel insofar as it relates to the production of the video footage from camera 29 from 9:35 a.m. until 10:01 a.m. on June 9, 2015, and any other video footage that depicts the removal of the Plaintiff's personal property, placing the Plaintiff in full restraints, moving him to the isolation cell, and the four hours that the Plaintiff remained in the isolation cell before and while his restraints were removed. The Court denies the remaining portion of the Plaintiff's motion to compel.

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. Defendant's Motion for Summary Judgment [Doc. 31] is **GRANTED IN PART** as to Defendants Harrington and Nichols on all claims and **DENIED IN PART** as to Defendants Hamilton based on the application of full mechanical restraints.

2. Plaintiff's Motion to Compel Discovery [Doc. 30] is **GRANTED IN PART** and **DENIED IN PART** in accordance with the terms of this Order. To the extent the Plaintiff's motion is granted, Defendant Hamilton shall comply with this Order within fourteen (14) days thereof or he shall file a report with the Court describing in detail why he cannot comply.

Signed: August 20, 2019

Frank D. Whitney
Chief United States District Judge