# THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# STATESVILLE DIVISION
# FILE NO. 5:17-CV-00108-GCM

| | |
|---|---|
| **ARTHUR LEE GIVENS-BEY,** | )<br>)<br>) |
| **Plaintiff,** | )<br>) **ORDER** |
| v. | )<br>) |
| **RAYMOND HAMILTON,** | )<br>) |
| **Defendant.** | )<br>) |

**THIS MATTER** came before the Court on a bench trial held on March 15, 2021. For the reasons set forth herein, the Court finds in favor of Defendant.

## I. PROCEDURAL HISTORY

Plaintiff is an inmate in the custody of the North Carolina Department of Public Safety ("NCDPS"), who was at all times relevant to this action housed in Alexander Correctional Institution. Pursuant to Section 1983 of Title 42 of the United States Code, Plaintiff commenced this case, proceeding *pro se*, by the filing of a Complaint in the Western District of North Carolina, on June 21, 2017. [D.E.1] Plaintiff brought the action against Lieutenant Nichols, Sergeant Harrington, Sergeant Murray, and Captain Raymond Hamilton alleging excessive use of force in violation of Plaintiff's Eighth Amendment rights.

Plaintiff alleged that on July 9, 2015, at approximately 07:57 hours, Lt. Nichols and Sgt. Harrington used excessive force when they used pepper spray to subdue Plaintiff after he failed to obey orders, used threatening language toward Nichols and Harrington and turned toward Nichols and Harrington in a threatening manner while in line with other inmates waiting to enter the dining facility. Plaintiff also alleged that on July 9, 2015, after having been pepper-sprayed, he was placed

in a shower cell but not allowed to decontaminate. Plaintiff alleged that he then fell to the floor, bled from his mouth, and after being compliant, was placed in full restraints unnecessarily.

Defendants Nichols, Harrington and Hamilton moved for summary judgment. [D.E. 31] This Court granted summary judgment in favor of Nichols and Harrington and dismissed the action against them. [D.E. 43] Defendant Murray was never served and the claims against him were dismissed without prejudice. [D.E. 46] The Court allowed Plaintiff to proceed to trial against Defendant Hamilton. [D.E. 43] Both parties waived their right to a jury trial [D.E. 69, 70], and a bench trial was conducted on March 15, 2021.

## II. FINDINGS OF FACT

Having reviewed and carefully considered the evidence presented at trial, the Court makes the following findings of fact:

1. On July 9, 2015, Plaintiff was an inmate at Alexander Correctional Institution ("Alexander CI"). Plaintiff is serving a life sentence for first-degree murder.

2. On July 9, 2015, Alexander CI was on modified lockdown as a result of a stabbing incident involving a member of the staff. At approximately 07:57 hours, Lt. Nichols and Sgt. Harrington were assisting Blue Unit monitor inmates headed to the dining hall. Lt. Nichols and Sgt. Harrington were staging inmates in groups of ten in a hallway prior to them being called to the dining hall. Plaintiff was in the hallway in one of the groups of ten.

3. Sgt. Harrington heard Plaintiff make what he perceived to be threatening comments. He specifically heard Plaintiff say, "I wish he would put his hand on me like that." Sgt. Harrington asked Plaintiff what he had said. Plaintiff immediately became loud and used profane and threatening language. Sgt. Harrington attempted to defuse the situation and ordered Plaintiff to remain calm or return to his cell. Plaintiff did not comply with Sgt. Harrington's order.

4. Lt. Nichols intervened and ordered Plaintiff to go to his cell. As he turned to go to his cell, Plaintiff suddenly started yelling in a threatening manner. Lt. Nichols ordered Plaintiff to get against the wall and submit to restraints. Plaintiff turned to the wall, but as he did so he clenched his fists. Based on the threatening language, the failure to obey orders and the threatening body language, Lt. Nichols and Sgt. Harrington pulled out their pepper spray bottles. Plaintiff then rapidly turned toward Lt. Nichols and Sgt. Harrington and shouted more threatening statements.

5. Lt. Nichols used his pepper spray. Sgt. Harrington attempted to use his pepper spray but the canister malfunctioned and he did not actually deploy his pepper spray. Since the time of the incident in question, the percentage of pepper used in pepper spray has been increased due to its former ineffectiveness.

6. After being pepper-sprayed, Plaintiff submitted to restraints. Plaintiff was placed in handcuffs with his hands to the rear of his body. Lt. Nichols and Sgt. Harrington began escorting Plaintiff to the shower area of the segregation unit.

7. Immediately after being pepper-sprayed, Plaintiff did not appear to be in distress. It appeared to Sgt. Harrington that Plaintiff was sprayed in the side and back of his head, lessening any adverse effect the pepper spray may have had on Plaintiff's eyes, nose, throat and lungs.

8. Lt. Nichols and Sgt. Harrington were relieved from escorting Plaintiff to the shower area by Correctional Officers Jacob Greene and Joshua Schoenen. Officer Green did not observe Plaintiff to be in any distress from the pepper spray. The video recordings of Plaintiff being escorted to the segregation unit confirm that Plaintiff was not in any distress or experiencing any significant physical symptoms as a result of the use of the pepper spray.

9. When Plaintiff arrived at the segregation unit he was immediately put in the shower cell. The door to the shower cell was locked, and Plaintiff was told to put his hands through the

food passage slot so the handcuffs could be removed and Plaintiff could be given a decontamination shower. The normal procedure is to not allow an inmate to take a shower with handcuffs on.

10. Plaintiff approached the food passage slot with his back to the slot. Sgt. Kyle Murray, who was in charge of the segregation unit to which Plaintiff had been escorted, testified that when Plaintiff approached the food passage slot, Plaintiff's hands were clenched in fists. Sgt. Murray ordered Plaintiff to open his fists, but Plaintiff did not obey. Sgt. Murray was concerned that Plaintiff may have a weapon in his hands, and he did not unlock the handcuffs.

11. When the handcuffs were not removed, Plaintiff became combative and used profane and threatening language. Plaintiff also indicated that he did not need a decontamination shower.

12. Captain Hamilton was the officer-in-charge of the day shift on July 9, 2015. At the time of the use of the pepper spray, he was monitoring inmates entering and leaving the dining hall.

13. Shortly after Plaintiff was escorted to the segregation unit, and after Plaintiff refused to open his hands so that the handcuffs could be removed, Captain Hamilton went to segregation to attempt to defuse the situation and get Plaintiff to submit his open hands through the food passage tray so the handcuffs could be removed and Plaintiff could receive a decontamination shower. Captain Hamilton was unsuccessful and returned to monitoring inmates entering and leaving the dining hall.

14. After an indeterminate time period, Plaintiff slumped to the floor. In an abundance of caution, a Code Blue—or request for medical assistance—was called so Plaintiff could be assessed for any injuries.

15. The nurse assessed Plaintiff and did not find any physical symptoms or adverse effects from the use of pepper spray.

16. There was no evidence other than Plaintiff's testimony that Plaintiff was bleeding or in severe pain as a result of the use of pepper spray.

17. When the Code Blue was called, Captain Hamilton returned to the segregation unit. He arrived after the nurse had determined Plaintiff was not injured or in physical distress.

18. Based on Plaintiff's earlier actions and words necessitating the use of pepper spray, based on Plaintiff's continued disobedience and threatening language when he arrived at the segregation unit, based on his earlier encounter with Plaintiff, and based on the recommendation of Sgt. Murray, Captain Hamilton ordered that the Plaintiff be put in full restraints and his personal property removed.

19. The use of full restraints is a commonly used method of transporting inmates or ensuring their compliance after an event in which the inmate has been disruptive, disorderly, fails to obey orders, or threatens the safety of staff or other inmates. Being placed in full restraints and remaining in full restraints is not painful as long as the inmate does not fight the restraints. Plaintiff had been placed in full restraints before July 9, 2015, without incident or injury.

20. Plaintiff was placed in full restraints. Plaintiff was checked by medical staff as the full restraints were applied. He was then escorted to an isolation cell.

21. Plaintiff was checked approximately every two hours after being placed in full restraints. Each time he was checked Plaintiff was compliant and a component of the full restraints was removed. Plaintiff was out of the full restraints and his property returned by the time Captain Hamilton's shift ended that day.

22. After the inmate is placed into the housing unit, the responsibility for the health and

welfare of an inmate is that of the Unit Manager and Assistant Unit Manager and their staff.

## III. DISCUSSION

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments," U.S. Const. amend. VIII, and protects prisoners from the "unnecessary and wanton infliction of pain," *Whitley v. Albers*, 475 U.S. 312, 327 (1986). To establish an Eighth Amendment claim, an inmate must satisfy both an objective component—that the harm inflicted was sufficiently serious—and a subjective component—that the prison official acted with a sufficiently culpable state of mind. *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996).

The objective component requires an inmate to satisfy that the harm inflicted was "harmful enough" to establish a constitutional violation. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 303 (1991)). This component is "contextual and responsive to 'contemporary standards of decency.'" *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).

When an inmate claims that prison officials used excessive force on him, he must meet a higher standard to establish the subjective component. This is because prison "[o]fficials are entitled to use appropriate force to quell prison disturbances." *Williams*, 77 F.3d at 761. "Because officials must act 'in haste, under pressure, and frequently without the luxury of a second chance,' deliberate indifference is not a sufficiently rigorous standard." *Id.* (quoting *Whitley*, 475 U.S. at 320). "Rather, in these circumstances, in order to make out an Eighth Amendment claim, a prisoner must demonstrate that officials applied force 'maliciously and sadistically for the very purpose of causing harm.'" *Id.* (quoting *Whitley*, 475 U.S. at 320–21).

In adjudicating an excessive force claim, subjective factors to consider include (1) "the need for application of force"; (2) "the relationship between that need and the amount of force

used"; (3) "the threat 'reasonably perceived by the responsible officials'"; and (4) "any efforts made to temper the severity of a forceful response." *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321)). The absence of serious injury is relevant but not dispositive. *Id.*; *see also Wilkins v. Gaddy*, 559 U.S. 34, 37–38 (2010). "From such considerations inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley*, 475 U.S. at 321. However, "equally relevant are such factors as the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." *Id.*

In this case, Plaintiff alleged and attempted to prove that Defendant Hamilton's approval of the use of force and placement of Plaintiff into an isolation cell without allowing him to decontaminate was excessive force in violation of the Eighth Amendment. For the reasons set forth below, Plaintiff did not prove, and the Court cannot conclude, that Captain Hamilton used or authorized others to use excessive force.

### A. Plaintiff Failed to Establish that Being Placed in an Isolation Cell without a Decontamination Shower was Cruel and Unusual Punishment.

The use of pepper spray in this instance has already been determined by this Court to have been warranted and not excessive. Therefore, the remaining question regarding the pepper spray is whether ordering Plaintiff to an isolation cell without a decontamination shower was cruel and unusual. For at least two reasons, the Court concludes that it was not.

First, all of the correctional staff indicated that Plaintiff was not in distress or suffering significant physical symptoms as a result of the use of pepper spray. This testimony is confirmed by the video recordings showing Plaintiff being escorted to the segregation unit. Plaintiff showed

no signs of distress in these video recordings. The video recordings do not show signs of Plaintiff's nose running, eyes watering, coughing or otherwise. Additionally, the relevant medical records do not record serious adverse effects or physical symptoms as a result of the use of pepper spray. This is also consistent with the testimony of the correctional staff that Plaintiff made statements regarding how the pepper spray did not "phase" him. As discussed above, though the fact that he was not injured or adversely affected by the pepper spray is not determinative on the issue of excessive force, it is strong evidence that the force was not excessive—especially in this case given that Captain Hamilton was not a part of the decision to use pepper spray.

Second, Plaintiff has not proven that he was not given the opportunity to receive a decontamination shower. Plaintiff was immediately escorted to the shower cell of the segregation unit. Sgt. Murray testified that he instructed Plaintiff to approach the food passage slot with his hands behind his back so Sgt. Murray could unlock and remove the handcuffs. In the video recording, Plaintiff is seen to approach the food passage slot with his back to Sgt. Murray. What happened as Plaintiff approached Sgt. Murray is unclear from the video recording. According to testimony from correctional staff, Plaintiff did not unclench his fists, and therefore Sgt. Murray did not unlock the handcuffs fearing that he may have had a weapon in one of his fists. After that initial encounter, Plaintiff can be seen to be agitated and shouting at the custodial staff. Sgt. Murray testified that he attempted to defuse the situation so he could unlock the handcuffs but was unsuccessful. Captain Hamilton also testified that he attempted to defuse the situation to allow him to unlock Plaintiff's handcuffs, but he too was unsuccessful. Plaintiff did not carry his burden of showing that he was not offered the opportunity to decontaminate.

 **B. Plaintiff Failed to Establish that Use of Full Restraints was Cruel and Unusual Punishment.**

Plaintiff alleged and attempted to prove that the use of full restraints was not necessary and was cruel and unusual punishment. Specifically, Plaintiff argued that at the time he was placed in full restraints he was compliant and therefore use of full restraints was not necessary and was a use of excessive force. The Court cannot conclude that the use of full restraints was excessive and cruel and unusual.

Use of full restraints is a common method used by custodial staff to transport inmates and to ensure safety of staff and other inmates. The full restraints are not painful or injurious as long as the person being restrained does not struggle. There is no evidence that Plaintiff struggled. There is no evidence that Plaintiff was injured in any way. Plaintiff had been placed in full restraints before this July 2015 occurrence without incident or injury.

In this case, Plaintiff was being transported from the shower cell to an isolation cell. Further, Plaintiff had repeatedly threatened staff and acted in a threatening manner. As stated in *Whitley,* "equally relevant are such factors as the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them." 475 U.S. at 321. In this case, Captain Hamilton knew that Plaintiff's threatening language and behavior had caused correctional staff to use pepper spray against Plaintiff initially. Captain Hamilton knew that when Plaintiff first reached the segregation unit he had continued to be combative and threatening. Captain Hamilton knew that his initial attempt to resolve the situation had been unsuccessful. And Captain Hamilton had seen inmates go from being compliant to violent in an instant. Captain Hamilton made the decision, based on the facts known to him, to authorize the use of full restraints. Plaintiff did not prove the objective component—that the use of full restraints was excessive force. Nor did Plaintiff prove the subjective component—that Captain Hamilton acted in a malicious or sadistic manner.

## IV. CONCLUSION

Based on the foregoing, the Court finds in favor of Defendant Hamilton. The Clerk of Court is directed to enter judgment accordingly.

**SO ORDERED**

Signed: May 10, 2021

Graham C. Mullen
United States District Judge